KELLY KLAUS (SBN 161091)
Kelly.Klaus@mto.com
ROSE LEDA EHLER (SBN 296523)
Rose.Ehler@mto.com
SHANNON GALVIN AMINIRAD (SBN 324780)
Shannon.Aminirad@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PARAMOUNT PICTURES CORPORATION; UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP; UNIVERSAL CONTENT PRODUCTIONS LLC; UNIVERSAL TELEVISION LLC; WARNER BROS. ENTERTAINMENT INC., COLUMBIA PICTURES INDUSTRIES, INC.; DISNEY ENTERPRISES, INC.; NETFLIX STUDIOS, LLC; NETFLIX US, LLC; and NETFLIX WORLDWIDE ENTERTAINMENT, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> DOES 1-10 d/b/a PRIMEWIRE, <br><br> Defendants. | Case No.  2:21-cv-09317 <br><br> **COMPLAINT FOR COPYRIGHT INFRINGEMENT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs bring this Complaint for copyright infringement under the Copyright Act (17 U.S.C. § 101 *et seq*.) against Does 1–10, the individuals (who have taken steps to hide their identities) who own and operate the websites www.primewire.li, www.primewire.ag, and www.primewire.vc (together with other websites owned and operated by Defendants[1] the "PrimeWire Websites") and related technology and internet protocol addresses presented to the public as "PrimeWire" (collectively, "Defendants").  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 17 U.S.C. § 501(b). Plaintiffs allege, on personal knowledge as to themselves and information and belief as to others, as follows:

## INTRODUCTION

1.       Defendants own, operate, and profit from PrimeWire, an illegal enterprise devoted to mass online copyright piracy.  PrimeWire provides users with unauthorized on-demand access to infringing streams of the world's most popular movies and TV shows, including those protected by copyrights that Plaintiffs or their affiliates own or exclusively control (the "Copyrighted Works").  Defendants fuel the illicit market for pirated content by connecting users to high-quality streams of pirated copies of everything from classics to popular new releases, including those just released in theaters such as Columbia Picture's *Ghostbusters: Afterlife* (released November 19, 2021) and Disney's *Encanto* (released November 24, 2021).

2.       The infringing nature of Defendants' service is obvious from even a cursory review of the PrimeWire Websites.  Starting with the very first screen, users are presented with an array of copyrighted movies and TV shows available

---

[1] For example, Defendants recently registered and launched vendtxt.com, which is a "mirror" website for PrimeWire.  Operators of pirate websites like PrimeWire frequently create "mirror" websites to move their illicit operations to another online location in response to successful anti-piracy actions.  Vendtxt.com is hosted at IP address 31.10.5.190.  From the user's perspective, vendtxt.com appears to be identical to the other PrimeWire Websites.

unlawfully for on-demand, free-to-the-user streaming.  Defendants curate titles into categories that make clear users can immediately access popular content, including "Featured Movies," "New Movies," and "Latest TV Shows to Air."  Defendants admit that watching movies and TV shows through PrimeWire is "risky"—in other words, Defendants are providing an illegal service—and Defendants "strongly urge" their users "to use a VPN [a virtual private network] to make themselves anonymous while streaming films and TV shows online."



3.     PrimeWire provides its users a too-good-to-be-true offering.  Users need only make a few clicks to start receiving illicit, on-demand streams of titles without any payment by the user or PrimeWire to the rights' holders.  The PrimeWire service is free to the user.  PrimeWire makes money by selling advertising on the site or by getting users to click on sponsored links.  PrimeWire includes titles that lawfully may be viewed only through licensed distribution channels and that often are in exclusive distribution "windows," including motion pictures in their initial theatrical release or available for streaming only through legitimate streaming services.  To take just a few examples, PrimeWire users can use the site to stream Disney's *Cruella* (2021), Universal's *Dear Evan Hansen* (2021), and Paramount's *Clifford the Big Red Dog* (2021), all of which were first released in theaters and for authorized on-demand streaming at the same time PrimeWire also made them available to its users.

4.     The scale of Defendants' infringement is breathtaking.  Defendants have drawn approximately 20 million *monthly* visits to the PrimeWire Websites in the United States, a number that has been growing.  PrimeWire's total monthly visits far exceed the number of visits to the websites of many lawful businesses, such as apnews.com, overstock.com, or delta.com.  Over half of global traffic comes from users in the United States.  Unsurprisingly, PrimeWire is one of the most popular websites for finding pirated content in the United States.

5.     Defendants operate an infringing enterprise for a simple reason:  to make money.  Defendants sell space on the site to third-party advertisers.  Defendants also generate revenue by including sponsored links on the PrimeWire Websites.  Defendants' business model uses the lure of unrestricted on-demand access to copyrighted content to generate substantial ill-gotten profits.

6.     Defendants know what they are doing is illegal.  Just as they exhort users to hide their identities by using VPNs to access the PrimeWire Websites, Defendants go to great lengths to cloak themselves in anonymity.  Defendants use

1 made-up names to communicate with users and provide false identifying
2 information to domain name registrars and other service providers.

3      7.     The harms that Defendants are causing to Plaintiffs are significant,
4 irreparable, and growing.  Plaintiffs and/or their affiliates have invested and
5 continue to invest substantial resources and effort each year to develop, produce,
6 and distribute their Copyrighted Works.  Plaintiffs themselves, or through their
7 affiliates, recoup their investments and invest in new movies and TV shows by
8 licensing their content through lawful channels, including services engaged in
9 authorized streaming.  Defendants' infringing service undermines the market for
10 licensed distribution and usurps Plaintiffs' exclusive rights under copyright.

11      8.     Defendants have increasingly focused their unlawful activities on the
12 United States as court orders in other countries have reduced the reach of the
13 PrimeWire Websites in those jurisdictions.  As PrimeWire grows in popularity in
14 the United States, so does the harm to Plaintiffs.  Plaintiffs bring this action to stop
15 Defendants' ongoing copyright infringement and to secure damages on account of
16 Defendants' blatantly unlawful conduct.

17 <center>**THE PARTIES**</center>

18      9.     Plaintiff Paramount Pictures Corporation ("Paramount") is a
19 corporation duly incorporated under the laws of the State of Delaware with its
20 principal place of business in Los Angeles, California.  Paramount owns or controls
21 copyrights or exclusive rights in content that it or its affiliates produce or distribute.

22      10.    Plaintiff Universal City Studios Productions LLLP is a limited liability
23 limited partnership duly organized under the laws of the State of Delaware with its
24 principal place of business in Universal City, California.

25      11.    Plaintiff Universal Content Productions LLC (formerly known as
26 Universal Cable Productions LLC and Universal Network Television, LLC) is a
27 limited liability company duly organized under the laws of the State of Delaware
28 with its principal place of business in Universal City, California.

12.    Plaintiff Universal Television LLC is a limited liability company duly organized under the laws of the State of New York with its principal place of business in Universal City, California.

13.    Plaintiffs Universal City Studios Productions LLLP, Universal Content Productions LLC, and Universal Television LLC are referred to individually and collectively as "Universal." Universal owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

14.    Plaintiff Warner Bros. Entertainment Inc. ("Warner Bros.") is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Burbank, California. Warner Bros. owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

15.    Plaintiff Columbia Pictures Industries, Inc. ("Columbia Pictures") is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Culver City, California. Columbia owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

16.    Plaintiff Disney Enterprises, Inc. ("Disney") is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Burbank, California. Disney owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

17.    Plaintiff Netflix Studios, LLC is a limited liability company duly incorporated under the laws of the State of Delaware with its principal place of business in Los Gatos, California.

18.    Plaintiff Netflix US, LLC is a limited liability company duly incorporated under the laws of the State of Delaware with its principal place of business in Los Angeles, California.

19.    Plaintiff Netflix Worldwide Entertainment, LLC is a limited liability company duly incorporated under the laws of the State of Delaware with its principal place of business in Los Angeles, California.

20.     Plaintiffs Netflix Studios, LLC, Netflix US, LLC, and Netflix Worldwide Entertainment, LLC are referred to individually and collectively as "Netflix."  Netflix owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

21.     Plaintiffs have obtained Certificates of Copyright Registration for their Copyrighted Works.  **Exhibit A** contains a representative list of movie and television program titles (along with their registration numbers, the corresponding entity that owns the copyright, the copyright registration number and date), the copyrights to which Defendants have infringed and continue to infringe.  The titles included on Exhibit A are only a sample of a much larger number (certainly in the thousands) of Copyrighted Works infringed through the PrimeWire Websites.

22.     PrimeWire operates in the United States through primewire.li, primewire.ag, and primewire.vc.  PrimeWire's IP address is 185.100.87.10.  That IP address traces to a hosting provider, FlokiNET, which lists PrimeWire's physical address as Beau Vallon, Seychelles.  Plaintiffs are informed and believe that Defendants can be contacted through admin@primewire.li (listed as the contact address for PrimeWire on its Websites) and admin@primewire.agmailto: (which sends emails regarding PrimeWire account creation).

23.     Defendants Does 1–10 are the individuals and/or entities who control and profit from www.primewire.li, www.primewire.ag, and www.primewire.vc, and who own, rent, lease or otherwise control PrimeWire's technology and infrastructure and enter into contracts with PrimeWire's service providers, including domain name registrars, hosting providers, proxy services, and advertising networks.

24.     Plaintiffs have exercised and will continue to exercise due diligence to determine Doe Defendants' true names, locations, and personal contact information. Plaintiffs will amend this complaint to allege Doe Defendants' true names, locations, and personal contact information if and when Plaintiffs ascertain that

1   information.  In the meantime, Plaintiffs are informed and believe that Defendants

2   can be contacted and served with process through email.

3                        **JURISDICTION AND VENUE**

4        25.    This Court has subject matter jurisdiction over this Complaint pursuant

5   to 28 U.S.C. §§ 1331, 1338(a), and 17 U.S.C. § 50l(b).

6        26.    This Court has personal jurisdiction over Defendants pursuant to

7   Federal Rule of Civil Procedure 4(k)(1)(A) and 4(k)(2).

8        27.    Defendants operate an interactive website for the primary purpose of

9   facilitating and profiting from copyright infringement.  Defendants thereby injure

10  Plaintiffs in this District, where each Plaintiff maintains headquarters or offices and

11  conducts a significant amount of its production and distribution operations.

12       28.    Defendants transact substantial business in the United States related to

13  their infringing operations, including through agreements with Cloudflare (a U.S.-

14  based website security company) and social media platforms such as Twitter (a

15  U.S.-based social networking company) and YouTube (a U.S.-based online video

16  sharing company).  Defendants use Cloudflare's proxy service to run its business

17  anonymously, and Defendants use Cloudflare's content delivery network ("CDN")

18  service to ensure its websites are fast and provide reliable services to users in the

19  United States.  Cloudflare records indicate that the PrimeWire accounts were

20  accessed by a potential Doe Defendant from an IP address associated with a Texas

21  internet service provider.  Defendants advertise and market their service to a United

22  States audience through promotions on social media platforms based in California,

23  including Twitter and YouTube.

24       29.    Defendants intentionally target users in the United States.  The

25  PrimeWire Websites are offered in English and moderators respond to questions

26  posed by PrimeWire users in English.  Defendants invoke United States law,

27  specifically the Digital Millennium Copyright Act ("DMCA"), and instruct

28  PrimeWire users to use a VPN to avoid "the government and the NSA [National

Security Agency]."  Defendants' users sign up for accounts with PrimeWire and agree to legal terms, including that their name, contact information, and country of residence may be used for advertising and other purposes by PrimeWire. Defendants then engage advertisers and sponsors based on their United States audience.  Defendants earn revenue through advertisers and sponsors who pay Defendants for access to Defendants' United States users.

30.     Over half of Defendants' worldwide traffic comes from U.S. users, a percentage that Defendants have sought to increase over time.  PrimeWire provides unauthorized access to an enormous quantity of popular copyrighted content created by the entertainment industry (predominantly based in California, United States), including content that characterizes certain lifestyles of California residents, such as *Million Dollar Listing Los Angeles*, *The Real Housewives of Beverly Hills*, and *Selling Sunset*.

31.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(6), 1400(a).

## BACKGROUND FACTS

### Plaintiffs and Their Copyrighted Works

32.     Plaintiffs and/or their affiliates produce and distribute a significant portion of the world's most sought-after, critically acclaimed, and award-winning movies and television programs.  Plaintiffs' ability to invest in new Copyrighted Works depends upon protection and enforcement of their rights under copyright law.

33.     Plaintiffs own or hold the exclusive U.S. rights to, among other things, reproduce, distribute, display, and publicly perform (including by means of streaming over the Internet) the Copyrighted Works.

34.     Plaintiffs themselves, or through their affiliates, authorize the legitimate distribution and public performance of the Copyrighted Works in various formats and through multiple distribution channels, including, by way of example: (a) through authorized, licensed cable and direct-to-home satellite services

(including basic, premium, and "pay-per-view"); (b) through authorized, licensed Internet video-on-demand ("VOD") services, including Apple TV+, Amazon Prime Video, Disney+, Google Play, HBO Max, Hulu, Netflix, Paramount+, and Peacock; (c) through authorized, licensed Internet or over-the-top streaming services, including those offered by Hulu Live TV, Fubo TV, Sling TV, and YouTube TV; (d) for private home viewing on DVD, Blu-ray, and UHD discs; (e) for exhibition in theaters; and (f) for broadcast television.

35. Plaintiffs have not authorized Defendants to stream any of the Copyrighted Works or to exercise any of Plaintiffs' other exclusive rights under the Copyright Act, 17 U.S.C. § 106.

**Defendants' Infringement of Plaintiffs' Copyrighted Works**

36. PrimeWire provides users with unauthorized VOD access to an enormous quantity of Plaintiffs' Copyrighted Works. The Copyrighted Works are streamed to users through embedded streaming via the PrimeWire Websites or through third-party websites and repositories to which Defendants curate links. Defendants encourage and induce the supply and consumption of infringing content through the PrimeWire service. Defendants use the Copyrighted Works as the bait to lure the largest possible audience, so that Defendants will profit from advertisements shown to their users. By their conduct, Defendants intentionally induce and knowingly contribute to the unauthorized reproductions, public performances, and display of the Copyrighted Works on a massive scale.

*PrimeWire Is Devoted to the Mass Infringement of Copyrighted Works*

37. The infringing nature of the PrimeWire service is blatant and obvious. PrimeWire's landing page prominently features copies of the cover art to Copyrighted Works available for free, on-demand streaming. Such cover art frequently contains still images from the underlying motion picture or TV show. Defendants have designed the entirety of the service to make it easy for users to find nearly any Copyrighted Work, including Plaintiffs' most popular titles.

38.    For example, if a user types "Wonder Woman" into the search box, PrimeWire returns a webpage with information (which PrimeWire appropriates from the IMDb.com and m.media-amazon.com website for movies and from TVMaze.com for television shows) about the movie, followed by multiple links for users to click to illegally stream the movie through the PrimeWire platform. The screenshot below shows only the first several links, but this particular search produced 20 active links to copies of *Wonder Woman* (2017) for streaming:



39.    By simply clicking on one of the "Version" links, an embedded media player opens on the PrimeWire Website and the user can watch the movie through the media player (or in full screen), without leaving that Website:

40.    A PrimeWire user can also choose to watch a title through a third-party website by clicking the "Direct" icon, represented by a box and arrow diagonally upward and shown in the lower left-hand corner of the above screenshot.  Doing so will open a window for streaming directly from the linked website:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17      41.     Defendants curate title listings into various categories that make plain
18 the service's infringing nature.  "Featured Movies," for example, includes popular
19 recent releases, like Warner Bros.'s *The Suicide Squad* (2021) and *Space Jam: A*
20 *New Legacy* (2021) and Disney's *Jungle Cruise* (2021).
21
22
23
24
25
26
27
28



Likewise, the category "New Movies" features those that are new to the market and new to the PrimeWire service like Columbia Pictures' *Venom: Let There Be Carnage* (2021).

42.    Defendants denote the quality of the linked content with symbols that indicate the quality of the source copy for the stream.



The symbols themselves make clear that the underlying copy has been made illegally.  A DVD icon indicates "High Quality."  The icon reflects that the copy available for streaming was ripped from a DVD, Blu-ray disc, or legitimate streaming service, thereby providing a perfect digital copy of the movie or TV show.  A "TS" icon indicates "Medium Quality."  TS is an abbreviation of "HDTS," an acronym referring to a bootleg recording of a film made from within the theater, sometimes from the projection booth, by a high quality camera with a direct connection to the sound source.  A camera icon indicates "low quality."  The icon reflects that the copy was made using a camcorder or another type of camera that recorded a performance of the movie or TV show on a theater or television screen.

43.     Defendants ask users to "vote" on the quality of the links on a scale of one to five stars.  Defendants curate the presentation of links based on these ratings, so as to ensure that the highest-ranked results will be the highest-quality streams. The image below shows several links for Universal's *Minions* (2015), each with hundreds of votes and a rating of one to five stars:



44.     Through these and other actions, Defendants cultivate loyalty to and awareness of PrimeWire as a high quality, reliable source for illegal streaming.

*Defendants Induce the Infringement of Copyrighted Works Because Their Business Depends on Infringement*

45.     The popularity and profitability of Defendants' site depends on high-volume infringing conduct.  Maintaining an evergreen collection of links to infringing copies is critical to keeping existing users and getting new ones, all of which is critical to Defendants' scheme to profit (through advertising and sponsored-link revenue) from high-volume infringing traffic to the site.

46.     Defendants encourage and rely on users to upload links to infringing content, including through an API (https://www.primewire.li/api).  This process sustains and grows Defendants' infringing service.  Defendants have stated on Internet forums that they "are looking for linkers," and have invited prospective users to "register for a new account" with PrimeWire "and start linking right away." In the same posting, Defendants have admitted that user-submitted "links will go through a moderation process," meaning Defendants or their agents check the submitted links and indisputably know their users are linking to infringing copies of Copyrighted Works.

47.     Once users start using PrimeWire, Defendants continue to urge them to post links to infringing content.  Defendants tell users which "approved" sites they can use as sources for infringing streams, and Defendants emphasize sites that pay users for uploading infringing content.  Defendants also implement a point system to reward users who contribute to the pirate enterprise.  Users are awarded 30 points for each new link.  Users with the highest monthly point totals are featured on PrimeWire's "Top Users" page.  Those at the top of the list have seeded Defendants' service with tens of thousands of links.

48.     Defendants likewise reward users with points for reporting "broken" links, i.e., links that do not take users to the content they request.  Getting rid of broken links furthers Defendants' goal of ensuring users receive high-quality

infringing streams and thus continue to use the service and promote its infringing use to others.

49. Defendants also curate and encourage users to curate content into collections that other users will find desirable. Defendants have implemented and maintain a "Playlist" feature, which invites users to submit links to groups of movies that organize and recommend movies and TV shows to stream. For example, Defendants promote a curated "Disney" Playlist, which features *Moana* (2016) and *Cars* (2006), among many other popular Copyrighted Works.



50. Defendants use metadata—key words that search engines use to rank search results—to maximize PrimeWire's visibility and priority in Internet search results for infringing websites. The metadata for the PrimeWire Websites include such terms as "letmewatchthis" and "theater releases."

51. Defendants also provide information that facilitates easy streaming. Defendants maintain a "How do I watch movies? Quick guide here …" that walks

users, step-by-step, through the process for watching videos through PrimeWire. Defendants also host and moderate a forum for users to discuss movies and sources for infringing content.

52.     Through these and other acts, Defendants promote (a) the unauthorized copying and uploading of movies and TV shows so PrimeWire has a perennial source of links to infringing content; and (b) the unauthorized streaming of content, so that users will return again and again to PrimeWire and promote the use of the service to others looking for unlicensed and free content.

*Defendants Profit from Their Infringing Conduct Through Referral Links and by Displaying Ads on the Sites*

53.     Defendants induce and facilitate infringing conduct through PrimeWire to make money from the illegal exploitation of copyrighted content.

54.     Defendants are paid when their users click on a link to another website or service that pays Defendants a referral fee.  For example, Defendants prominently feature advertisements and links for the ExpressVPN service on the PrimeWire Websites.  When a PrimeWire user clicks through to ExpressVPN and signs up for its VPN services, ExpressVPN pays Defendants a referral fee.  PrimeWire has a similar "sponsored" relationship with the "Unlimited Streaming" (unltdentertainment.co) website, which appears to be a scheme to obtain users' credit card information rather than a legitimate streaming service.

55.     Defendants also sell advertising on the PrimeWire website. Advertisements "pop up" as users navigate through the site and are required to be viewed by users before the stream of the movie or TV show starts.  Advertisements focus on products like VPN services, which Defendants describe as "Support[ing] the Site."  While PrimeWire describes its site as "family friendly," the site is replete with ads containing sexually explicit material.  These explicit ads are visible to all users, regardless of age, as PrimeWire does not utilize any age-gating protections to ensure that ads of a mature nature are displayed only to adults.

56.     Defendants use third-party advertising networks, which have changed over time, but currently include Clickadu, to place advertisements on the PrimeWire website.  The ad networks link advertisers to the PrimeWire service.  The advertisers pay the networks, and the networks then credit PrimeWire with a share of that revenue when users open the ads on the PrimeWire site.  These advertisers are indifferent to whether the advertisements are legitimate or fraudulent and numerous comments on the site note the risk of malware to users who click on the wrong link.

57.     For these reasons, among others, high-volume use of PrimeWire as a source for illegal streaming translates into significant amounts of ill-gotten profits flowing into Defendants' pockets.

*Defendants Know They Are Engaged in Illegal Conduct*

58.     Defendants know they are engaged in mass copyright infringement. Defendants go to great lengths to hide their identities.  Defendants use aliases on their forum.  Moderators are known as "Dev_Team," "Silverrain," "Fugitive," and "drodman250," each of whom uses a stock image profile picture and fake location, such as "Fugitive" who claims to be from "Valyria, Earth" (a *Game of Thrones* reference):



59.     Defendants provide false information in registering their domains, so the WHOIS information cannot be used to identify them or their location.

60.     Defendants likewise encourage their users to take steps to remain anonymous, further betraying Defendants' knowledge that they are facilitating unlawful activity.  At the moment users access the site, Defendants encourage them to buy a VPN from ExpressVPN so users will avoid being identified or having streams blocked.

61.     Over the past several years, Defendants have grown their presence in the United States substantially.  In less than three years, Defendants' U.S. user base has grown from less than 1 million monthly visits to approximately 20 million monthly visits.

62.     Defendants openly mock the idea of being constrained by legal rules. Defendants' "Legal Stuff" webpage tells users that the "governing law" for use of

the site "will be that of the Klingon Empire, the country in which primerwire.ag is based and from which all services are provided."

---
**— Legal Stuff** ─────────────────────────────

**General**
Our terms of service are to be taken into consideration and adhered to at all times whilst using the site. All users are advised that access to this site and the use of the services detailed therein are strictly conditional upon your confirmation that you comply fully with our terms of use. By proceeding to surf primerwire.ag or otherwise using this site, you signify your unequivocal acceptance of these and any other terms prevailing at this or at any future time.

**Governing Law**
The governing law imposed will be that of the Klingon Empire, the country in which primerwire.ag is based and from which all services are provided.

---

**Defendants' Mass Infringement Causes Plaintiffs Immediate and Irreparable Harm**

63.    The scope of Defendants' infringement of Plaintiffs' Copyrighted Works is massive and growing.  Defendants infringe Plaintiffs' Copyrighted Works 24 hours a day, seven days a week throughout the United States.

64.    Plaintiffs exercise their exclusive rights by licensing their Copyrighted Works to distributors and downstream services to develop and grow markets for their copyrighted content, particularly the quickly evolving and increasingly important digital markets.  Defendants' conduct usurps Plaintiffs' control over the exercise of these exclusive rights, interfering with those distribution strategies.

65.    Defendants illegally and unfairly compete with Plaintiffs' licensed subscription VOD services, such as Disney+, HBO Max, Hulu, Netflix, Paramount+, Peacock, and others, which have the right to offer on-demand content, often exclusively.  Defendants offer access to a library of titles not available on any single licensed VOD service, but refuse to pay for the licenses that the law requires that someone have before streaming the Copyrighted Works.  The result is television and movie content streamed over the internet in a manner that directly competes with and undermines authorized VOD services.  As such, Defendants also interfere

with Plaintiffs' affiliated VOD offerings and Plaintiffs' existing relationships with legitimate services that license and offer VOD content.

66.     Defendants have an unfair competitive advantage over legitimate, licensed services.  The legitimate services negotiate their licenses and abide by contractual restrictions.  Defendants need not honor such contractual restrictions because they circumvent the licensing process altogether.  This unfair competition undermines both Plaintiffs' relationships with licensees and the legitimate market for VOD content streamed over the Internet, which is a robust and growing part of Plaintiffs' businesses and an important option to many consumers.

67.     If left unchecked, Defendants' infringing conduct will continue to grow.  Defendants' user base will continue to expand.  All of this conduct is causing immediate and irreparable harm to Plaintiffs, and that harm will continue until Defendants are enjoined from engaging in their illegal conduct.

# FIRST CAUSE OF ACTION

## (Intentionally Inducing the Infringement of the Copyrighted Works)

68.     Plaintiffs incorporate herein by reference each and every averment contained in paragraphs 1 to 67 inclusive.

69.     Defendants induce the infringement of Plaintiffs' exclusive right of public performance by supplying and promoting the use of links that connect users to unauthorized online sources that stream Plaintiffs' copyrighted works.

70.     Defendants further induce the infringement of Plaintiffs' exclusive right of reproduction and public performance by encouraging users to supply the PrimeWire service with links to infringing copies of movies and TV shows.  In order for a link to provide access to an infringing stream, a third party must make an infringing reproduction of the Copyrighted Work to serve as the source copy for the stream.  The streams from those infringing copies to Defendants' users are themselves infringing public performances of the underlying works.

71.     Defendants' intentional inducement of the infringement of each Copyrighted Work constitutes a separate and distinct act of infringement.

72.     Defendants' inducement of the infringement of the Copyrighted Works is willful, intentional, and purposeful, and in disregard of and with indifference to Plaintiffs' rights.

73.     As a direct and proximate result of the infringement that Defendants intentionally induce, Plaintiffs are entitled to damages and Defendants' profits in amounts to be proven at trial.

74.     Alternatively, at their election, Plaintiffs are entitled to statutory damages, up to the maximum amount of $150,000 per infringed work, by virtue of Defendants' willful infringement, or for such other amounts as may be proper under 17 U.S.C. § 504.

75.     Plaintiffs further are entitled to recover their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

76.     As a direct and proximate result of the foregoing acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiffs' rights in the Copyrighted Works.  Plaintiffs are entitled to injunctive relief under 17 U.S.C. § 502.

## SECOND CAUSE OF ACTION

### (Contributory Copyright Infringement by Knowingly and Materially Contributing to the Infringement of the Copyrighted Works)

77.     Plaintiffs incorporate herein by reference each and every averment contained in paragraphs 1 to 76 inclusive.

78.     Defendants have knowledge of the third parties' infringement. Defendants systematically amass from third parties thousands of links to Copyrighted Works that necessarily were reproduced before being hosted by third-

party websites and cyberlockers (i.e., third-party server repositories that store infringing copies of movies and TV shows) from which end users can stream the content directly.  Defendants know these third parties do not have authorization to create the copies of these works or stream or transmit performances of those works to members of the public.

79. Defendants materially contribute to the third parties' infringement. Defendants configure and promote the use of PrimeWire to connect users to unauthorized online sources streaming Plaintiffs' Copyrighted Works.  The operators of these cyberlockers and repositories control facilities and equipment used to copy and stream performances of Plaintiffs' Copyrighted Works.  The operators infringe Plaintiffs' exclusive reproduction and public performance rights by copying and publicly performing the Copyrighted Works without Plaintiffs' authorization.  By operating PrimeWire, Defendants facilitate, encourage, and enable the direct infringement of Plaintiffs' Copyrighted Works.

80. Defendants' knowing and material contribution to the infringement of Plaintiffs' rights in each Copyrighted Work constitutes a separate and distinct act of infringement for which Defendants are liable.

81. Defendants' knowing and material contribution to the infringement of the Copyrighted Works is willful, intentional, and purposeful, and in disregard of and with indifference to Plaintiffs' rights.

82. As a direct and proximate result of Defendants' infringement, Plaintiffs are entitled to damages and Defendants' profits in amounts to be proven at trial.

83. Alternatively, at their election, Plaintiffs are entitled to statutory damages, up to the maximum amount of $150,000 per infringed work, by virtue of Defendants' willful infringement, or for such other amounts as may be proper under 17 U.S.C. § 504.

84. Plaintiffs further are entitled to recover their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

85.     As a direct and proximate result of the foregoing acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiffs' rights in the Copyrighted Works.  Plaintiffs are entitled to injunctive relief under 17 U.S.C. § 502.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiffs pray for judgment against Defendants and for the following relief:

1.     That Defendants, their officers, agents, servants, employees, and any persons against whom injunctive relief may be ordered pursuant to Fed. R. Civ. P. 65 be permanently enjoined and restrained from:

(a)     Hosting, linking to, distributing, reproducing, copying, uploading, making available for download, indexing, displaying, exhibiting, publicly performing, communicating to the public, streaming, transmitting, or otherwise exploiting or making any use of any of Plaintiffs' Copyrighted Works or any portion(s) thereof in any form;

(b)     Taking any action that directly or indirectly enables, facilitates, permits, assists, solicits, encourages or induces any user or other third party (i) to copy, host, index, reproduce, download, stream, exhibit, distribute, communicate to the public, upload, link to, transmit, publicly perform, or otherwise use or exploit in any manner any of Plaintiffs' Copyrighted Works or portion(s) thereof; or (ii) to make available any of Plaintiffs' Copyrighted Works for copying, hosting, indexing, reproducing, downloading, streaming, exhibiting, distributing, communicating to the public, uploading, linking to, transmitting, publicly performing, or for any other use or means of exploitation;

(c)     Transferring or performing any function that results in the transfer of the registration of the domain names of the PrimeWire Websites to any other registrant or registrar;

(d)     Assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs (a)–(c).

2.     For such other equitable relief, including but not limited to an order that Defendants' PrimeWire Websites and/or the corresponding domain names, or any subset of these domain names specified by Plaintiffs, be disabled by the appropriate domain name registries, and/or the registrars holding or listing one or more of the domain names of the PrimeWire Websites (the "Registries and/or Registrars"), and that Defendants' IP addresses associated with the PrimeWire Websites be disabled by web hosting providers.

3.     For Plaintiffs' damages and Defendants' profits in such amount as may be found; alternatively, at Plaintiffs' election, for maximum statutory damages or for such other amounts as may be proper pursuant to 17 U.S.C. § 504(c).

4.     For a declaration that Defendants' activities as alleged herein constitute direct and secondary copyright infringement of Plaintiffs' exclusive rights under copyright in violation of 17 U.S.C. § 106.

5.     For prejudgment interest according to law.

6.     For Plaintiffs' attorneys' fees and full costs incurred in this action pursuant to 17 U.S.C. § 505.

7.     For all such further and additional relief, in law or in equity, to which Plaintiffs may be entitled or which the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues triable by jury.

1    DATED:  December 1, 2021          MUNGER, TOLLES & OLSON LLP

2

3

4                                      By:    /s/ Kelly M. Klaus
                                              KELLY M. KLAUS
5                                      Attorneys for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28